IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

EVELYN GARRISON, ELBIE CANNON,   *
AIDET ELIAS, TRACY EMERY,   *
RUBEN GARCIA, DAVID B. GEORGE,   *
CHRISTOPHER JOHNSON, KYLE   *
MOSS, TONIA ORNDORFF, LANE A.   *
SCOTT AND CHRIS A. WILLIAMS,   *
each individually and on behalf of all   *
others similarly situated,   *
   *
            Plaintiffs,   *
   *
vs.   *     No. 4:12-cv-00737-SWW
   *
   *
   *
CONAGRA FOODS PACKAGED   *
FOODS, LLC d/b/a CONAGRA FOODS,   *
   *
            Defendant.   *

OPINION AND ORDER

Plaintiff Evelyn Garrison brought this action against her former employer,

defendant ConAgra Foods Packaged Foods, LLC d/b/a ConAgra Foods (ConAgra),

seeking to recover unpaid overtime under the Fair Labor Standards Act (FLSA), 29

U.S.C. § 201 *et seq.*, the Arkansas Minimum Wage Act (AMWA), Ark. Code Ann. § 11-

4-201 *et seq.*, and a common law theory of unjust enrichment/quantum meruit.  In

addition to her three individual claims, Garrison alleged a collective action claim under

the FLSA and a class action claim under the AMWA.  The Court granted conditional

certification of Garrison's collective action claim under the FLSA after which ten other

individuals–Elbie Cannon, Aidet Elias, Tracy Emery, Ruben Garcia, David B. George,

Christopher Johnson, Kyle Moss, Tonia Orndorff, Lane A. Scott, and Chris A. Williams–opted into the action. Thereafter, Garrison filed a First Amended and Substituted Complaint that included the ten opt-in individuals as named plaintiffs and dropped the class action claim under the AMWA.[1]

Now before the Court is ConAgra's motion for summary judgment [doc.#69] on grounds that plaintiffs were employed in a bona fide executive capacity and, thus, were not entitled to overtime compensation. Plaintiffs have responded in opposition to ConAgra's motion and ConAgra has replied to plaintiffs' response. At the request of ConAgra, the Court held a hearing on ConAgra's motion for summary judgment on the morning of November 7, 2014. For the reasons that follow, the Court grants ConAgra's motion for summary judgment.

I.

ConAgra maintains a facility in Russellville, Arkansas (the "facility"), that produces frozen packaged foods. The facility is one of ConAgra's largest production facilities and one of the largest frozen food manufacturing facilities in the country. It is 760,183 square feet with at least ten distinct production lines and areas.

The facility employs approximately 1,250 total employees, with only 90 salaried employees. It operates three shifts, running production or sanitation for 24 hours on most days. The facility is separated into numerous departments, including production,

---

[1] By order entered October 9, 2014, the Court granted the unopposed motion of ConAgra to dismiss plaintiff Ruben Garcia from this action for his failure to attend his own deposition.

warehouse (also called shipping and receiving), quality, maintenance, sanitation, finance, environmental health and safety, and human resources (HR).

All plaintiffs were employed as "Team Leaders" and were salaried as opposed to hourly employees.  The plaintiffs' job titles and dates of employment at the facility are as follows:

- Evelyn Garrison was a Production Team Leader at the facility from before November 21, 2009, until she was discharged in September 2012.

- Elbie Cannon was a Production Team Leader at the facility from before November 21, 2009, until he was discharged in August 2010.

- Aidet Elias was a Production Team Leader at the facility from before November 21, 2009, until she was demoted to a non-managerial role in April 2011.

- Tracy Emery was a Sanitation Team Leader at the facility from before November 21, 2009, until he was discharged in November 2010.

- David B. George was both a Production Team Leader and a Sanitation Team Leader at the facility from before November 21, 2009, until he became totally disabled by a motorcycle accident in November 2010.

- Christopher Johnson was a Production Team Leader at the facility from before November 21, 2009, until he was discharged in July 2010.

- Kyle Moss was a Production Team Leader at the facility from before November 21, 2009, until he took military leave that began in August 2013.

- Tonia Orndorff was a Production Team Leader at the facility from before November 21, 2009, until she was discharged in January 2013.

- Lane A. Scott was a Maintenance Team Leader at the facility from before November 21, 2009, until he resigned in August 2010.

- Chris A. Williams was a Maintenance Team Leader at the facility from

before November 21, 2009, until he was discharged in June 2011.

Among other things, it was plaintiffs' job duty to monitor the performance and behavior of the hourly employees and to identify poor performance and rules violations. Plaintiffs were paid a bi-weekly salary that ranged from $1,770.69 ($46,037.94 annually) to $2,365.38 ($61,499.88 annually) during the relevant time period. Plaintiffs' salary did not decrease based on the number of hours they worked or the quality of their performance.

Although the exact arrangement varied during the relevant period, the general management structure of the facility remained the same. Within the production department, the hourly employees were directly supervised by Team Leaders, who were responsible for managing one or more lines or areas of production on a specific shift. During 1st Shift, there were around seven Production Team Leaders and on 2nd Shift there were around eight. Production Team Leaders were supervised by six Managers: four who worked on 1st Shift and were responsible for production in a zone of the plant (comprised of multiple lines or areas of production) across shifts, one who supervised the entire plant on 2nd Shift (and was the only Manager in the facility for most of 2nd Shift), and one who supervised the entire plant on 3rd Shift (and was the only Manager in the plant for most of 3rd Shift). The six Managers who directly supervised Production Team Leaders reported to the Operations Manager, who oversaw all of production and sanitation in the plant and reported directly to the Plant Manager.

Within the maintenance department, the hourly employees were directly

supervised by Team Leaders who were responsible for managing maintenance for a zone of the plant (comprised of multiple lines or areas of production) on a specific shift. During 1st Shift, there were between one and three Maintenance Team Leaders and on 2nd Shift there were either one or two.  Maintenance Team Leaders reported to a Maintenance Manager who worked on 1st Shift, was responsible for maintenance across the facility, and reported directly to the Plant Manager.

Within the sanitation department, the hourly employees were directly supervised by one to three Team Leaders who were responsible for managing sanitation for at least one zone of the plant (comprised of multiple lines or areas of production) on the 3rd Shift. Sanitation Team Leaders reported to a Manager who was responsible for managing the entire plant on 3rd Shift and who reported to the Operations Manager.

In the production, maintenance, and sanitation departments, the Team Leader was the highest ranking member of management who was physically present in each area or zone for the majority of each workday.  For the majority of the time since November 2009, HR did not have any personnel in the facility for the majority of 2nd and 3rd Shift.

During the time period covered by this action, the production department, in which plaintiffs Garrison, Cannon, Elias, George, Johnson, Moss, and Orndorff worked, had approximately 300 hourly employees on 1st Shift and 250 hourly employees on 2nd Shift. The maintenance department, in which plaintiffs Scott and Williams worked, had around 30 hourly employees on 1st Shift, and 30 hourly employees on 2nd Shift.  And the sanitation department, in which plaintiffs Emery and George worked, had around 130

hourly employees on 3rd Shift.

The non-clerical hourly employees are represented by a Union, the International Brotherhood of Teamsters, and the hourly workers' employment is governed by a collective bargaining agreement (CBA).  Within each department, the hourly employees are placed into classifications based on the job they perform, and the CBA sets the rate of pay for each classification.  The plaintiffs, who were not members of the Union, were responsible for knowing the terms of the CBA and ensuring they followed it while supervising their employees.

The CBA dictates a probationary period for new hires.  During that probationary period, hourly employees can be terminated without recourse.

Promotions for hourly employees are also controlled by the CBA.  In order to permanently fill open positions, ConAgra must post the position, allow employees to bid for it, and award it to the employee with the most seniority who bids for it, regardless of qualification.  Employees use the bidding process to move into a classification that pays more or has more desirable job duties or to change to a more desirable shift.  Once in the new position, the employee has a limited period (30 days) in which to "qualify" for the new position by training and demonstrating their ability to perform the new position's duties.  If the employee does not qualify during the qualification period, he or she returns to his or her previous classification and is prevented from bidding for another promotion for nine months.

Demotions for hourly employees are likewise controlled by the CBA.  During the

time that any plaintiff was working at ConAgra, hourly employees who were assessed to be unable to perform their job duties could be removed from their position and placed into the lowest paying classification on the same shift and in the same department through a disqualification process.  Although the disqualified employees would not necessarily be terminated, the demotions always resulted in a position with less pay and often with significantly different job duties.

Plaintiffs and their fellow Team Leaders were responsible for scheduling over 1,000 hourly employees every day.[2]  As required by the CBA, the schedule for the hourly employees was completed one day ahead of time.

The process for scheduling the hourly production employees on each shift moved in several steps and involved all of the Team Leaders on that shift.  First, each Team Leader–including plaintiffs–was responsible for scheduling his or her lines or areas for the day.  The number and classification of employees who were needed on the Team Leaders' lines varied depending on the product being run that day. Thus, plaintiffs reviewed the product or products their lines would produce the next day, determined the number and classification of employees they would need the next day, compared that to the number of employees assigned to their team, identified the number and classifications

_____

[2] Plaintiffs, however, assert that "[s]cheduling was not handled by all of the Plaintiffs individually, but rather scheduling was handled by one team leader, or in the case of sanitation, scheduling was handled by an hourly employee."  Pl.s' St. of Undisp. Facts, ¶ 37 [doc.#74].  In support of this assertion, plaintiffs cite only paragraph 37 of plaintiff George's declaration in which he states that "based on the time I spent as a team leader in production: One team leader managed all scheduling.  In sanitation, scheduling for overtime was done by a line lead exclusively."

of employees that were usually assigned to the Team Leader but would not be needed the next day and/or the number and classifications of additional employees that each plaintiff would need, and communicated that information to a single Team Leader who–in addition to managing production on his or her lines–served as the "scheduler" for that shift.

Second, the Team Leader serving as the scheduler would take the input from each of the Team Leaders and attempt to move employees around to cover all of the requests from the Team Leaders.  When a Team Leader requested more employees, the scheduler could either provide them from a different line that had too many or pull them from the "extra board," a pool of employees of various classifications who were not assigned to a line.  Based on the facility's labor needs for the day and the available workers, the scheduler and/or the Team Leaders could temporarily reclassify employees to cover any shortfalls in a particular classification.  This often resulted in an employee moving from a classification with a lower rate of pay into a classification with a higher rate of pay. When that occurred, the CBA dictated that the employee be compensated at the higher rate. (If the employee was moved into a lower-paying classification, their pay was not reduced.)  Even when the reclassification did not result in a change in pay, it could result in substantially different job duties.

If the scheduler had a surplus of employees, those employees were scheduled on the extra board and showed up to cover any employees who called in sick.  Hourly employees who showed up as scheduled but were not utilized were entitled to a minimum (but reduced) number of hours for the day under the CBA, which they would work before

being sent home, decreasing their compensation for that day.

Finally, plaintiffs were responsible for determining at the start of every shift whether they had enough employees to run their production for that day. Based on call-ins or changes in the production schedule, plaintiffs could find themselves short employees, in which case they could pull employees from the extra board and/or temporarily reclassify employees if needed. If there were not enough available employees to cover a shift, plaintiffs also possessed the authority to request hourly employees to work overtime. In particular, when scheduling production for the weekends, plaintiffs determined how many employees would be needed and how much overtime would be offered.[3]

In the sanitation department, plaintiffs scheduled the 3rd Shift sanitation employees each night, directing them where to go within the facility. If there were not enough employees available on 3rd Shift, plaintiffs possessed the authority to request 2nd Shift employees to remain and to work overtime. In the maintenance department, one plaintiff or other Maintenance Team Leader on each shift (usually the Team Leader who was to scheduled work the weekend) set a weekly schedule for all of the team members across the department for the shift, assigning the maintenance employees to the various zones of

---

[3] Plaintiffs, however, assert that "[t]he CBA dictated the order in which hourly employees would be reclassified and upper-level management that either authorized or prohibited overtime." Pl.s' St. of Undisp. Facts, ¶ 44 [doc.#74]. In support of this assertion, plaintiffs cite only paragraph 38 of plaintiff George's declaration in which he states that "[m]anagement sometimes prohibited any overtime work at all; other times it permitted overtime work. If it were permitted, it was not really a question of whether or not we had the authority to request second shift employees to remain and to work overtime: We were mandated to."

the facility and determining the number of maintenance employees who would work overtime during the weekend. Individual Maintenance Team leaders–including plaintiffs–were responsible for setting the daily schedule for the team members assigned to their zones, adjusting start and end times based on the needs of production in those zones. Plaintiffs had the authority to require their team members to stay for overtime if required to meet production's maintenance needs.[4]

The CBA frames ConAgra's ability to discipline its employees, provides the employees with significant procedural rights, and dictates a grievance process that can result in review of discipline by an arbitrator. The CBA mandates progressive discipline–that is, for most rules violations or performance issues, ConAgra cannot suspend or discharge an employee unless both an oral warning (a first-step discipline) and a written warning (a second-step discipline) have already been issued (with no more than nine months between any disciplinary steps).[5]

For certain major rule violations, the CBA allows ConAgra to skip steps and move directly to suspending or discharging an employee (a third-step discipline). Any suspension or discharge (whether resulting from an accumulation of discipline or from a major rules violation) must be for "just cause," all discipline must be issued within eight

---

[4] Plaintiffs deny this, again asserting that "[t]he CBA dictated the order in which hourly employees would be reclassified and upper-level management that either authorized or prohibited overtime." Pl.s' St. of Undisp. Facts, ¶ 46 [doc.#74]. In support of this assertion, plaintiffs cite only paragraph 38 of plaintiff George's declaration.

[5] Plaintiffs do not dispute ConAgra's characterization of the CBA concerning discipline and discharge but do deny that the provisions of the CBA were always followed.

days of the underlying infraction, and employees are entitled to due process–including an investigation and opportunity to present their side–before any decision to suspend or discharge can be made.

After it is issued, employees are able to grieve any disciplinary decision on the basis that it violates the CBA or other agreement between ConAgra and the Union (*e.g.*, if the discipline is not supported by just cause, if it did not result from a proper investigation, if management improperly skipped steps in progressive discipline, or if management treated the employee in arbitrary manner compared to his or her peers).  If it is not grieved, then the discipline remains as issued.

## II.

ConAgra moves for summary judgment on grounds that (1) plaintiffs are exempt from the FLSA's overtime requirements because they are employed in a bona fide executive capacity, (2) plaintiffs are exempt from the AMWA's overtime requirements because they are employed in a bona fide executive capacity, and (3) plaintiffs' unjust enrichment/quantum meruit claims–based on their statutory claims–fail as a matter of law.

## A.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," or show "that the materials cited do not establish the absence or presence of a genuine dispute," or "that

an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P.

56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider

other materials in the record." Fed.R.Civ.P. 56(c)(3). The inferences to be drawn from

the underlying facts must be viewed in the light most favorable to the party opposing the

motion. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986) (citations

omitted). Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge. *Reeves v.

Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation and quotation marks

omitted). However, "[w]here the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,*

475 U.S. at 587 (citation omitted). "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes

that are irrelevant or unnecessary will not be counted." *Id*.

## B.

### 1.

The Court first turns to plaintiffs' FLSA claim. The FLSA generally requires

employers to pay their employees at least one and one-half times their regular wage rate

for hours worked in excess of 40 hours in a given week. 29 U.S.C. § 207(a)(1).

However, the overtime pay requirements of the FLSA "shall not apply with respect to ...

any employee employed in a bona fide executive, administrative, or professional

capacity...." 29 U.S.C. § 213(a)(1).  ConAgra claims that as a matter of law, plaintiffs were employed in a bona fide executive capacity and, thus, were exempt from the FLSA's overtime pay requirements.

The employer has the burden to prove that its employee is an executive and therefore exempt from the FLSA's overtime pay requirements.  *Madden v. Lumber One Home Center, Inc.*, 745 F.3d 899, 903 (8th Cir. 2014) (citation omitted).  Exemptions to the FLSA are narrowly construed to protect workers.  *Id*.  "In addition, the Office of Personal Management has promulgated a regulation requiring that the designation of an employee as FLSA exempt or nonexempt must ultimately rest on the duties actually performed by the employee."  *Id*. (citing 5. C.F.R. 551.202(e)).[6]  "Disputes regarding the nature of an employee's duties are questions of fact, but the ultimate question whether an employee is exempt under the FLSA is an issue of law."  *Jarrett v. ERC Props., Inc.*, 211 F.3d 1078, 1081 (8th Cir. 2000) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

Whether an employee meets the executive exemption is determined by applying Department of Labor regulations.  *Madden*, 745 F.3d at 903 (citation omitted).  The Department of Labor defines an "executive" employee–that is, one exempt from FLSA requirements relating to overtime pay–as follows:

> (A) The term 'employee employed in a bona fide executive capacity' in section 13(a)(1) of the Act shall mean any employee:

---

[6] While not binding on courts, the regulation is instructive.  *Id*.

(1) Compensated on a salary basis at a rate of not less than $455 per week ... exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

Plaintiffs concede that their job duties met the first three elements of 29 C.F.R. § 541.100(a); each plaintiff was paid on a salary basis at a rate in excess of $455 per week, each plaintiff's primary duty was the management of a customarily recognized subdivision of ConAgra's enterprise, and each plaintiff customarily and regularly directed the work of multiple employees.  Thus, the only issue with respect to plaintiffs' FLSA claim is whether plaintiffs' job duties met the requirements of the fourth element, *i.e.*, whether plaintiffs had the ability to hire and fire other employees, or whether their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight.

Concerning the fourth element, ConAgra acknowledges that plaintiffs did not

possess the authority to unilaterally hire or fire any employee.[7]  Rather, ConAgra argues

that plaintiffs and their fellow Team Leaders were the members of ConAgra's

management team with the best opportunity to supervise and direct the hourly workers

and plaintiffs' suggestions and recommendations regarding numerous personnel decisions

were given particular weight.

> The Department of Labor defines "particular weight" as follows:
>
> To determine whether an employee's suggestions and recommendations are
> given 'particular weight,' factors to be considered include, but are not
> limited to, whether it is part of the employee's job duties to make such
> suggestions and recommendations; the frequency with which such
> suggestions and recommendations are made or requested; and the frequency
> with which the employee's suggestions and recommendations are relied
> upon.  Generally, an executive's suggestions and recommendations must
> pertain to employees whom the executive customarily and regularly directs.
> It does not include an occasional suggestion with regard to the change in
> status of a co-worker.  An employee's suggestions and recommendations
> may still be deemed to have 'particular weight' even if a higher level
> manager's recommendation has more importance and even if the employee
> does not have authority to make the ultimate decision as to the employee's
> change in status.

29 C.F.R. § 541.105.

Many different employee duties and levels of involvement can work to satisfy the

fourth element.  *Madden*, 745 F.3d at 904.  For example, "one way [an employer can

show] that the purported executives' input into personnel decisions was given particular

---

[7] "[B]ut neither did any member of management" notes ConAgra.  Stringer Aff. ¶ 46;
Steen Aff. ¶ 42.  ConAgra notes that "[a]ll discharge decisions were reviewed and finalized by
HR and the Union always had the opportunity to challenge the decision all the way through
arbitration."  *Id.*

weight ... is to show that the purported executives' input had more influence than hourly employees' input." *Id*. at 906.  Other "[e]vidence that an employee's recommendation are given 'particular weight' could include witness testimony that recommendations were made and considered; the exempt employee's job description listing responsibilities in this area; the exempt employee's performance reviews documenting the employee's activities in this area; and other documents regarding promotions, demotions or other change of status that reveal the employee's role in this area." *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees,* 69 Fed.Reg. 22122, 22135 (April 23, 2004).[8]  "An employee who provides guidance on any one of the specified changes in employment status may meet the section 541.100(a)(4) requirement." *Id*. at 22131.

Although the Department of Labor has not added a definition of "change of status" to the final regulation, "the Department intends that this phrase be given the same meaning as that given by the Supreme Court in defining the term 'tangible employment action' for purposes of Title VII liability." *Id*.  As noted by the Department of Labor, the Supreme Court in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998), defined "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

---

[8] This regulatory preamble does not bind the Court to any particular interpretation of the FLSA or its regulations but it is persuasive because it rests on a body of experience and informed judgment to which courts and litigants may properly resort for guidance. *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 561 (2nd Cir. 2012) (quotation marks and citation omitted).

responsibilities, or a decision causing a significant change in benefits."

With these standards in mind, the Court now turns to an examination of whether ConAgra has met its burden of proving that plaintiffs were employed in a bona fide executive capacity and therefore exempt from the FLSA's overtime pay requirements. With the exception of plaintiff Moss, each plaintiff states in a declaration that "I did not make decisions or recommendations regarding the hiring, firing, advancement, promotion or any other change in status of ConAgra's employees, nor was it my duty to do so." Garrison Decl. ¶ 5; Scott Decl. ¶ 5; Emery Decl. ¶ 5; George Decl. ¶ 5; Williams Decl. ¶ 5; Orndorff Decl. ¶ 5; Elias Decl. ¶ 5; Cannon Decl. ¶ 5; Johnson Decl. ¶ 5.[9]  ConAgra, however, claims it has met its burden of proving that plaintiffs were employed in a bona fide executive capacity because plaintiffs' recommendations as to whether to discharge or retain a probationary employee were given particular weight, plaintiffs' recommendations regarding promotions and demotions were given particular weight, plaintiffs possessed the authority to temporarily reassign (or to recommend temporary reassignment) of employees to higher paying positions and regularly set schedules for hourly employees, which often resulted in working fewer than full time hours or overtime opportunities, and plaintiffs' recommendations for discipline (up to and including unpaid suspensions and terminations) were given particular weight.  The Court will address these claims in turn.[10]

---

[9] Plaintiff Moss has not submitted a declaration.

[10] Citing no authority, plaintiffs argue that evidence that took place outside the statutory period is irrelevant and should be disregarded by the Court.  To the contrary, evidence of the entire period during which plaintiffs were employed as Team Leaders is relevant.  See *Mallas v.*

<u>Discharge or Retention of a Probationary Employee</u>

Brian Stringer, Director of Operations at the facility, and Terry Steen, HR Manager for the facility from February 2009 until April 2012, state in affidavits that in light of the impracticability of tasking just a handful of Managers with supervising the performance and conduct over 1,000 hourly employees, Team Leaders–including plaintiffs–were required to shoulder the bulk of the responsibility for monitoring, training, directing, and evaluating the hourly employees.  Concerning probationary employees, Stringer and Steen state that unless and until plaintiffs identified an issue with the probationary employee's performance, plaintiffs were the exclusive evaluators of the probationary employees in their areas, as they were the only members of management who regularly observed the new employees performing their job duties during the probationary period, and that it was therefore plaintiffs' job duty to inform their Manager or HR if they believed that a probationary employee was not able to satisfactorily perform his or her job duties.  They state that if plaintiffs did not raise any concerns, then probationary employees were retained, but that if plaintiffs did identify a performance issue for a probationary employee, HR and plaintiffs' upper-level managers would rely on plaintiffs' evaluation of the employee's performance, determine if there was sufficient

_City of Puyallup_, 201 F.3d 444 (9th Cir. 1999) (rejecting as "too narrow" plaintiff's argument that the court can consider only evidence relating directly to the period after December 17, 1994, the date from which he may claim back overtime under the applicable statute of limitations, and noting that plaintiff "was employed in the same position from 1988 to 1997, so evidence of his duties during that entire period is relevant."); _Childers v. City of Eugene,_ 120 F.3d 944, 946 (9th Cir. 1997) (considering entire 10-year period during which exemption was claimed in determining whether "salary basis" requirements were violated).

documentation to support termination, and, if so, the employee would be discharged.

Stringer and Steen state that in some cases, Team Leaders provided positive feedback

regarding probationary employees, either formally through a written evaluation or

informally through conversations with management and HR. Stringer Aff. ¶¶ 25, 29-32;

Steen Aff. ¶¶ 19, 23-26.[11]

Plaintiffs' job descriptions list "appraising performance" as one of their

supervisory responsibilities and the record shows that Team Leaders provided feedback

regarding probationary employees.  For example, plaintiff George acknowledged that

during the probationary period, it was important as a Team Leader to identify if a new

employee was going to be a problem and that if the new employee was a problem, he

would go to the Manager and alert him or her about that issue.  George Depo. at 249-50.

Plaintiff Johnson testified that of the four probationary employees he supervised, HR

called him and asked him what he thought, and Johnson replied, "yeah, keep them,

they're all good workers," and all four employees were in fact kept.  Johnson Depo. at

---

[11] During the hearing on ConAgra's motion for summary judgment, counsel for plaintiffs acknowledged that counsel for ConAgra "accurately characterized" the affidavits of Stringer and Steen "as being unrebutted, at least self-contained and – self-contained statements about how life is actually lived there."  Tr. 20-21.  Counsel for plaintiffs went on to note, however, that "the affidavits are just laden with the notion that if a team leader reports something, that that's inherently a recommendation.  And I think that if you are, as the team leaders maintained consistently, if all you are doing is rounding up facts when they are not seen or reporting facts that you have seen, that somehow doing that with the facts constitutes some kind of recommendation or an urging that it should go in one direction as opposed to another.  And that's not the impression that the plaintiffs drew from their experience there."  Tr. 21.  As noted by ConAgra, this essentially is a dispute regarding the label placed on plaintiffs' conduct, not the facts of the conduct itself.

246-49.  Plaintiff Moss acknowledged that as a Team Leader, he would give his input to the Manager as to how probationary employees were doing and that if he thought they were doing a good job, they would be able to get out of the probationary period and become a full-time employee and if not he would go to the Manager and explain the problem.  Moss Depo. at 51-52.[12]  In this respect, probationary employees were not automatically retained, and plaintiffs' recommendations led to the discharge of several probationary employees.  For example, plaintiffs Garrison and Moss recommended the discharge of Robert French, who was not retained.  Garrison Depo. at 180-83; Moss. Depo. at 146-48, 205-07.  And, as previously noted, plaintiffs' positive reviews also led to the retention of others.

An employer's reliance on production supervisors' recommendations regarding probationary employees "comports with the regulatory requirement that an executive's

---

[12] Other plaintiffs testified that they did not remember having any probationary employees or that they did not have any probationary employees to evaluate because of the shift they worked.  For example, plaintiff Emery testified it is possible that he recommended a probationary employee not be retained but that he didn't recall the specifics.  Emery Depo. at 149-50.  This, however, contradicts his later declaration testimony in which he stated that he made recommendations on probationary employees but that "[o]nce I became convinced that making a recommendation was a waste of time, I quit making recommendations."  Emery Decl. ¶ 11.  Similarly, plaintiff Elias testified that she did not remember having any probationary employees because they usually started on second shift and she was on first shift.  Elias Depo. at 201-02.  But this contradicts her later declaration testimony in which she stated that in her five years at ConAgra, she in fact "had probationary employees but was never once asked for feedback on them during their probationary period; and, I did not volunteer any information on them."  Elias Decl. ¶ 11.  A party cannot defeat summary judgment by submitting an affidavit or declaration contradicting his or her earlier deposition testimony.  *Lykken v. Brady*, 622 F.3d 925, 933 (8th Cir. 2010) (citing *Camfield Tires, Inc. V. Michelin Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983).

suggestions and recommendations as to hiring 'are given particular weight.'" *Beauchamp v. Flex-N-Gate LLC*, 357 F.Supp.2d 1010, 1016 (E.D. Mich. 2005); see also *Rainey v. McWane Inc.*, 314 Fed.Appx. 693, 696 (5th Cir. 2009) (per curiam) (an employee meets the fourth element by providing recommendations for the hiring of probationary employees as full-time employees); *Wilbur v. Silgan Containers Corp.*, No. 2:06-cv-02181-MCE-EFB, 2008 WL 3863700, *9 (E.D. Cal., Aug. 19, 2008) (an employee whose recommendations regarding the retention of probationary employees were afforded particular weight met the fourth element of the executive exemption).  Accordingly, the Court finds that ConAgra has met its burden of establishing that plaintiffs' recommendations as to whether to discharge or retain a probationary employee were given particular weight.

<u>Promotions and Demotions</u>

Stringer and Steen state that plaintiffs may not have been responsible for selecting employees for promotion or advancement in the first instance, but their evaluations and recommendations determined whether an employee would retain such promotion.  They state that unless and until plaintiffs identified an issue with a qualifying employee's performance, plaintiffs were the exclusive evaluators of the qualifying employees in their areas, as they were the only members of management who regularly observed the employees performing their job duties during the qualifying period.  Stringer and Steen state it was therefore plaintiffs' job duty to inform their Manager or HR if they believed that a qualifying employee was not able to satisfactorily perform his or her new job

duties.  They state that if plaintiffs did not raise any concerns, then the employee would retain his or her new position but that if plaintiffs did identify a performance issue for a qualifying employee, HR and plaintiffs' upper-level Managers would rely on plaintiffs' evaluation of the employee's performance, determine if there was sufficient documentation to support a finding that the employee was not qualified, and, if so, the employee would be sent back to his or her previous position.  Stringer and Steen state that no hourly employees had any role in evaluating an employee's performance during qualification.  Stringer Aff. ¶¶ 55, 58-61; Steen Aff. ¶¶ 51, 54-56, 58.

Likewise, Stringer and Steen state that although the disqualified employees would not necessarily be terminated, the demotions always resulted in a position with less pay and often with significantly different job duties.  They state that plaintiffs were expected to monitor the job performance of all of their employees, and if an employee's performance is sufficiently poor, they have the authority to recommend that employee for disqualification, which results in the employee's demotion to the lowest paying  position available.  Stringer and Steen state that the plaintiffs were expected to recommend that underperforming employees be disqualified from their positions and demoted into less demanding ones.  They state that because plaintiffs were the members of management who were most familiar with their employees' performance, management placed significant weight on their recommendations with regard to disqualification.  Stringer Aff. ¶¶ 62-64, 66; Steen Aff. ¶¶ 59-61, 63.

As previously noted, plaintiffs' job descriptions list "appraising performance" as

one of their supervisory responsibilities, and consistent with the affidavit testimony of Stringer and Steen, plaintiff Elias testified concerning evaluating qualifying employees that the Team Leader would observe the employee and decide if they could do the job and if not, they would be disqualified back to their old position.  Elias Depo. at 197.  Other plaintiffs testified similarly.  For example, plaintiff Cannon testified concerning the manner in which management relied on Team Leaders' observations of employees who were qualifying:

> Q. So would HR come out and evaluate their performance and kind of watch them do the job?
>
> A. I was -- I was usually the one watching them.
>
> Q. Because you were the one that's actually there?
>
> A. I was -- yes, I was the one there.
>
> Q. So you would give some statement or feedback to HR and Joel?
>
> A. Yes.
>
> Q. Was there ever a time where you thought someone should not have qualified and they were kept in that position?
>
> A. No.
>
> Q. Was there ever a time where you thought someone did qualify, but they were disqualified?
>
> A. No.
>
> Q. Right, which makes sense because if Joel and HR aren't the ones actually watching them, you know, how are they going to decide differently than what you've decided, right?

A. They made -- I didn't decide anything.

Q. That's fair. How would Joel and HR make a decision if they weren't going to rely on your observations?

A. That's how they made -- it was my observations, they made the decisions.

Cannon Depo. at 182-83.

Similarly, plaintiff Moss testified that it's the Team Leader who observes the employee and determines whether he or she is qualified to do the job. Moss Depo. at 47. Plaintiff Moss testified that if the Team Leader determines that the employee cannot do the job, the Team Leader disqualifies that employee (although he noted that the Manager likes to know what's occurring on their shift and why the Team Leader thinks the employee should be justified). Moss Depo. at 47-48. In this respect, plaintiffs have identified employees who were disqualified following their recommendations. For example, plaintiff Elias disqualified Jose Mejia, plaintiff Moss disqualified Esther Lara, and plaintiff Orndorff disqualified Carrie Hailey. Elias Depo. at 171, 271; Moss Depo. at 218-23; Orndorff Depo. at 165-66. Each of these employees was demoted as a result. Conversely, plaintiff Cannon identified an employee who his Manager believed should be disqualified but was in fact not disqualified based on plaintiff Cannon's opposition. Cannon Depo. at 245-46. Accordingly, the Court finds that ConAgra has met its burden of establishing that plaintiffs' recommendations regarding promotions and demotions were given particular weight.

Temporary Reassignment and Schedules for Hourly Employees

Stringer and Steen state that while management was generally informed of the need to temporarily reclassify an employee or to incur overtime, such requests were typically approved because of the plaintiffs' knowledge of their teams and their familiarity with their employees' ability to work across classifications.  Stringer Aff. ¶ 78; Steen Aff. ¶ 79.  Plaintiffs essentially acknowledge that they possessed the authority to temporarily reassign (or to recommend temporary reassignment) of employees and that they scheduled overtime for hourly employees.  Plaintiffs argue, however, that "these transfers were only for the day, meaning the alleged reassignment would last only for that hourly employee's shift," that "[t]his type of transfer ... does not constitute a 'change in status,'" and that the scheduling of overtime for hourly employees was "a temporary action that does not result in a decrease in pay and is therefore not a 'change in status.'"

The Court rejects plaintiffs' apparent and unsupported argument that a change of status must be "permanent" or that a change of status must be "adverse."[13]  As the Court in *Bacon v. Eaton Corp.*, 565 Fed.Appx. 437, 440 (6th Cir. 2014), suggested, a temporary reassignment can be a change of status (*e.g.*, if it causes a reduction in pay or benefits),[14]

---

[13] Plaintiffs Garrison, Emery, George, Williams, Orndorff, Elias, Cannon, and Johnson state in their declarations that they never recommended any employee for a *permanent* change in status, see Garrison Decl. ¶ 27; Emery Decl. ¶ 26; George Decl. ¶ 26; Williams Decl. ¶ 23; Orndorff Decl. ¶ 26; Elias Decl. ¶ 26; Cannon Decl. ¶ 26; Johnson Decl. ¶ 26, while plaintiff Scott states in his declaration that he doesn't recall ever recommending any employee for a *permanent* change in status.  Scott Decl. ¶ 26.  Plaintiff Moss, as previously noted, has not submitted a declaration.

[14] *Cf. Miller v. Federal Express Corp.*, 56 F.Supp.2d 955, 960-61 (W.D. Tenn. 1999) (rescinding termination did not render action non-adverse in part because plaintiff lost five days of pay and bonuses).

and the Department of Labor's executive exemption regulation as well as its adoption of

the Supreme Court's definition of "tangible employment action" clearly demonstrate that

a "change of status" does not have to be adverse. See 29 C.F.R. § 541.100(a)(4) (the

majority of the enumerated "changes of status" are positive–hiring, advancement, and

promotion); see also *Ellerth*, 524 U.S. at 761 (including in its definition of "tangible

employment actions" actions that are either positive–hiring–or at least neutrally

phrased–"reassignment with significantly different responsibilities" or "causing a

significant change in benefits"); *Vance v. Ball State University* 133 S. Ct. 2434, 2446-47

nn.8, 9 (2013) (identifying "salary increases," promotions, and reassignments with

"economic consequences" as "tangible employment actions"). This Comports with the

Eighth Circuit's basing a finding of executive exemption solely on input into hiring and

its noting that "many different employee duties and levels of involvement can work to

satisfy [the executive exemption's] fourth element." *Madden*, 745 F.3d at 904, 907-08.

See also *Johnson v. Derhaag Motor Sports, Inc.*, No. 13-cv-2311 (SRN/FLN), 2014 WL

5817004, *16 (D. Minn. Nov. 10, 2014) (defendants satisfied fourth element of executive

exemption where plaintiff did not contest that he provided separate defendant with

recommendations about whom to hire, and separate defendant claimed that plaintiff

provided persuasive input about whether to hire several employees and noted that he

wouldn't have hired anybody that plaintiff thought wouldn't fit into the mix of the people;

court found that there accordingly were no genuine issues of fact about whether separate

defendant gave plaintiff's recommendations about whom to hire particular weight). It is

clear, then, that reassignment of employees, even if temporary, which results in economic consequences for such employees can effect a change of status for those employees, satisfying the fourth element of the executive exemption analysis.

Concerning reassignments and scheduling, plaintiff George acknowledged that as a Team Leader, he was able to fill temporary vacancies by temporarily moving someone from one classification to another.  George Depo. at 87-88.[15]  This often resulted in an employee moving from a classification with a lower rate of pay into a classification with a higher rate of pay.  Further, plaintiff George's deposition testimony shows that although one Team Leader was the "central scheduler," all Team Leaders were responsible for scheduling their own areas and communicating needs with the "central scheduler." George Depo. at 85-89.  Plaintiff George's declaration testimony that "[o]ne team leader managed all scheduling," see n.2, *supra* (quoting George Decl. ¶ 37), does not controvert the asserted fact that plaintiffs and their fellow Team Leaders were responsible for scheduling.

In addition to their ability to reassign employees, plaintiffs' authority to schedule the hourly employees also involved increasing and decreasing the hours of work for their employees and identifying the need for employees to work overtime, which resulted in direct economic consequences for their employees.  See *Cotton v. Cracker Barrel Old*

---

[15] Plaintiffs primarily rely only on plaintiff George's declaration in disputing ConAgra's claim that their role in reassignments and scheduling satisfied the fourth element of the executive exemption analysis.

*Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006) ("A reduction in an employee's

hours, which reduces the employee's take-home pay, qualifies as a tangible employment

action."); *Loudermilk v. Stillwater Milling Co.,* 551 F.Supp.2d 1281, 1290 (N.D. Okla.

2008) ("[D]enial of overtime may be sufficient in some cases to constitute a tangible

employment action ....").  Plaintiff George's declaration testimony that if  overtime "were

permitted, it was not really a question of whether or not we had the authority to request

second shift employees to remain and to work overtime: We were mandated to," see n.3,

*supra* (quoting George Decl. ¶ 38), contradicts his earlier deposition testimony:

> Q. When you requested overtime, that was a request that was made to a
> production manager?
>
> A. Yes.
>
> Q. And how often were those requests denied?
>
> A. Typically, if you knew your limitations, basically you knew what you
> had to have, absolutely had to have, generally it was you weren't refused.
>
> Q. So were you the kind of team leader who knew exactly what you had to
> have at a minimum?
>
> A. Yes.
>
> Q. So when you asked your manager, it was usually a situation where you
> knew you had to have that employee or your line just wouldn't run?
>
> A. Yes. I knew it wouldn't run at its potential.
>
> Q. Okay. So when you, specifically you, requested overtime, was it usually
> allowed by the manager?
>
> A. Probably 80 percent of the time it was allowed.

George Depo. at 100-01.

Plaintiffs also assert that "in the case of sanitation, scheduling was handled by an hourly employee."  Pl.s' St. of Undisp. Facts, ¶ 37 [doc.#74].  In support of this assertion, plaintiffs cite only paragraph 37 of plaintiff George's declaration in which he states that "[i]n sanitation, scheduling for overtime was done by a line lead exclusively."  See n.2, *supra* (quoting George Decl. ¶ 37).  Plaintiff George's earlier deposition testimony, however, contradicts this assertion:

Q. Who did the scheduling for sanitation?

A. At times it was -- I believe when Lannis [plaintiff George's sanitation Manager when he first was a sanitation Team Leader] was there, he did a lot of the scheduling. Tracy Emery was very involved in the scheduling.

Q. And Tracy Emery is another team leader, correct?

A. Correct. And later on Carrie [plaintiff George's sanitation Manager for the majority of his time in sanitation] wanted us to -- wanted Tracy to show us how to do the schedule so -- because I think she was relying on him to do the schedule and she had him show us how to do it.  At that time Dustin Cheatham was on the shift, I remember Dustin being there.

Q. And Dustin is another team leader?

A. Yes, sir.

· · ·

Q. Okay. And you remember Dustin Cheatham being involved in this training on how to do scheduling?

A. Yes.

Q. And did you also receive training from Mr. Emery on how to do the scheduling?

-29-

A. Yes.

Q. Did you ever do the scheduling for sanitation?

A. Yes.

George Depo. at 29, 112-13.  See also George Depo. at 121-125 (describing the overtime process when he was a sanitation Team Leader and noting that overtime was primarily handled by Team Leaders because the Manager was late all the time and that they came in early to do the schedule so they would know how many additional people they would need and who had volunteered).

As previously noted, a party cannot defeat summary judgment by submitting an affidavit or declaration contradicting his or her earlier deposition testimony, *Lykken*, 622 F.3d at 933, and the Court finds that ConAgra has met its burden of establishing that plaintiffs possessed the authority to temporarily reassign (or to recommend temporary reassignment) of employees to higher paying positions and that plaintiffs regularly set schedules for hourly employees, which often resulted in working fewer than full time hours or overtime opportunities.

Discipline

Stringer and Steen state that plaintiffs' job duties included disciplining employees, and that plaintiffs played a significant role in initiating, investigating, recommending, and issuing discipline, up to and including unpaid suspensions and discharge (either progressively through an accumulation of discipline or for a major rules violation).  They state that plaintiffs were the only members of management who spent a significant

amount of time monitoring their team members' performance and behavior and that plaintiffs were expected to set expectations for their employees through coaching and to formally counsel employees (a documented pre-discipline step) with Union stewards present when those expectations were not  met.  Stringer and Steen state that plaintiffs did not have to report all rules violations or performance issues to upper-level management or HR for discipline. They state that plaintiffs had the authority–and were expected–to use their discretion to decide when a rules violation or repeated violations justified discipline, and they should only have involved management at that time.  Stringer and Steen state that once plaintiffs identified poor performance or misconduct that they believed warranted discipline they were expected to initiate the discipline by informing their upper-level Manager or HR, to write up the discipline if approved by their upper-level manager or HR, and to issue the discipline to the employee with a union steward present. They state that in their management role, they understood a plaintiff's decision to initiate the disciplinary process as a recommendation for discipline, and that they similarly understood a plaintiff's decision or recommendation to suspend an employee pending an investigation to be a recommendation to either discharge or suspend without pay. Stringer and Steen state that if a Team Leader was alerted to poor performance or a rules violation by another hourly employee or someone outside of his or her department, he or she was expected to investigate in order to confirm the alleged infraction before initiating discipline.  They state that management gave significantly more weight to reports of misconduct and recommendations of discipline from plaintiffs than was given to

occasional reports of misconduct from hourly employees and that if management received a report of misconduct from an hourly employee regarding another hourly employee, management would refer it to the alleged wrongdoer's Team Leader–including plaintiffs–to investigate and initiate discipline if the Team Leader believed it was warranted.  Stringer Aff. ¶¶ 47-49, 52-53; Steen Aff. ¶¶ 43-45, 48-49.

Plaintiffs essentially acknowledge they initiated the progressive discipline process. Indeed, plaintiffs' job descriptions include as part of their supervisory responsibilities "rewarding and disciplining employees."  Plaintiffs argue, however, that in the case of suspension or termination of hourly employees, they had no authority to issue such discipline but merely carried out the directives of their superiors and that any recommendations they made concerning discipline were not given particular weight.[16]

Stringer and Steen state that the majority of the time, HR and management agreed with plaintiffs' recommendations regarding the decision to issue discipline and the level of discipline to issue.  Stringer Aff. ¶ 51; Steen Aff. ¶ 47.  Consistent with this affidavit testimony, plaintiffs admitted in their depositions that they recommended discipline for certain employees and that management followed those recommendations, with most plaintiffs testifying that management followed their disciplinary recommendations with a regularity ranging from most of the time to always.  See Cannon Depo. at 198-99

---

[16] The fact that the Team Leaders were operating under procedures prescribed by the CBA did not, as suggested by plaintiffs, render then non-exempt.  Rather, "[e]nsuring that company policies are carried out constitutes 'the very essence of supervisory work.'"  *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (C.A. Mass. 1982) (quoting *Anderson v. Federal Cartridge Corp.*, 62 F.Supp. 775, 781 (D.C. Minn. 1945), *aff'd*, 156 F.2d 681 (8th Cir. 1946)).

(testifying that HR or management disagreed with his decision to discipline "[m]aybe once"); Elias Depo. at 280 (testifying that she could not remember a single time when her recommendation of discipline was not followed); Emery Depo. at 143 (acknowledging that his "recommendation or [his] suggestion that disciplinary action be taken was generally followed"); Garrison Depo. at 171-72 (testifying that "[m]ost of the time" when she submitted discipline it "stuck"); George Depo. at 226 (testifying that it "wasn't very often" that his recommendations of discipline were not followed by his Manager); Johnson Depo. at 235-36 (testifying that HR issued discipline to 90-93% of the employees he sent their way); Moss Depo. at 166 (testifying that he could not "remember any times when any Manager told [him] not to issue discipline when [Moss] went to them and said [he was] going to"); Orndorff Depo. at 167-68, 176-78 (testifying that she could not recall recommending an employee for discipline that management did not discipline (although she stated there were instances but that she just couldn't recall) and specifically identifying an employee that she recommended for discipline and her Manager agreed with her recommendation); Scott Depo. at 259-60 (testifying that he could not remember a time when he approached HR regarding discipline and he was instructed not to issue discipline); Williams Depo. at 45-46 (testifying that management frequently agreed with his recommendations regarding discipline).

There is no question that discipline recommended by the plaintiffs and agreed to by management constituted a change of status. In this respect, plaintiffs initiated discipline against many employees pending an investigation (sometimes conducted by

plaintiffs at HR's direction) and ConAgra ultimately suspended those employees without

pay or discharged those employees.  For example:

- Plaintiff Johnson suspended employee Elenilson Ponce pending an investigation after Ponce accidentally damaged manufacturing equipment. ConAgra discharged Mr. Ponce.

- An hourly employee reported harassment by employee Michael Shannon to plaintiff Cannon, who conducted an investigation and provided the investigation results to HR.  ConAgra discharged Shannon.

- Plaintiff Elias observed an employee, Bobby Evans, recklessly driving a walkie machine and addressed the issues with Evans, who responded by arguing with Elias.  Elias initiated discipline by reporting the behavior to management and ConAgra discharged Evans.

- Plaintiff Emery learned that one of his employees, Bobby Lievasy, had sprayed silicone into the face of another team member.  Emery conducted an investigation and issued an unpaid suspension to Lievasy.

- Plaintiff Garrison initiated discipline for and investigated a verbal altercation between two employees on her line.  ConAgra suspended one of the employees (Angelica Hernandez) without pay.

- Plaintiff George initiated discipline for employee Artemio Avalos and suspended him pending investigation after Mr. Avalos released equipment in an unsanitary condition. ConAgra suspended Avalos without pay.

- Plaintiff Moss suspended employee Osmin Enriquez pending investigation after another employee reported to Moss that Enriquez had been involved in horseplay in violation of the rules.  Moss investigated, obtained written statements from Enriquez and the other employee, and suspended Enriquez. ConAgra suspended Enriquez without pay and Moss participated in a meeting with Enriquez and HR to discuss the decision to suspend (and not to discharge) Enriquez–a decision with which Moss agreed.

- After learning that an incorrect ingredient had been used on her line, plaintiff Orndorff investigated, concluded it was caused by employee Jorge Jovel's mistake, determined that Jovel's next step of discipline would be a suspension, initiated that discipline for Jovel, suspended Jovel pending an

investigation with her Manager's approval, prepared a statement regarding her investigation, and emailed her Manager with details regarding the amount of money lost due to the mistake.  ConAgra suspended Jovel without pay for three days.

● Plaintiff Scott suspended employee David Guy Hill pending investigation after Hill reached the third step of progressive discipline by failing to meet Scott's expectations for the management of the bulk oil room.  Scott acknowledged that by issuing discipline for Hill, he would be recommending his suspension and termination.  Although Hill was not discharged, ConAgra suspended Hill without pay.

● With his Manager's approval, plaintiff Williams suspended employee Ed White pending an investigation after Williams witnessed White violating ConAgra's confined space rules, which constituted a major rules infraction. ConAgra suspended White without pay.

Initiating the disciplinary process that leads to an employee's suspension without pay or discharge is enough to comport with the regulatory requirement that the plaintiffs' disciplinary recommendations and suggestions were given particular weight.  See *Burson v. Viking Forge Corp.*, 661 F.Supp.2d 794, 805 (N.D. Ohio 2009) (noting it was undisputed that shift supervisors initiated the disciplinary process, generally by first issuing a verbal warning to the employee, and finding this was sufficient to satisfy the "particular weight" requirement); *Scott v. SSP America, Inc.*, No. 09-CV-4399 (RRM) (VVP), 2011 WL 1204406, *15 (E.D.N.Y. March 29, 2011) ("Plaintiff's authority to recommend suspensions and to initiate disciplinary process against the unionized, hourly employees is sufficient to show that her recommendations and suggestions as to changes in employment status and firing were given particular weight."); *Beauchamp,* 357 F.Supp.2d at 1016 (finding that supervisors suggestions and recommendations were given

"particular weight" where "[they] typically initiated the progressive disciplinary process set forth in the collective bargaining agreement that would lead to an hourly worker's discharge").  Accordingly, the Court finds that ConAgra has met its burden of establishing that plaintiffs' recommendations for discipline (up to and including unpaid suspensions and terminations) were given particular weight.

*    *    *

In sum, whether it be in the area of discharge or retention of probationary employees, promotions and demotions, temporary reassignment and scheduling of hourly employees, or discipline, the Court finds that there are no genuine issues of material fact for trial and that ConAgra has met its burden of proving that plaintiffs were employed in a bona fide executive capacity and therefore exempt from the FLSA's overtime pay requirements.  Accordingly, the Court grants ConAgra's motion for summary judgment on plaintiffs' FLSA claim.

2.

Turning to plaintiffs' AMWA claim, the Court notes that the AMWA, like the FLSA, does not apply to "[a]ny individual employed in a bona fide executive, administrative, or professional capacity...."  Ark Code Ann. § 11-4-203.  In this respect, the AMWA "appears to impose the same overtime requirements as the FLSA."  *Helmert v. Butterball, LLC*, 805 F.Supp.2d 655, 663 n.8 (E.D. Ark. 2011) (citing *Phillips v. Pine Bluff*, No. 5:07cv00207, 2008 WL 2351036, *5 (E.D. Ark. June 4, 2008)); see also *Johnson v. Arkansas Convalescent Centeres, Inc.*, No. 5:12-cv-143-DPM, 2013 WL

3874774, *2 (E.D. Ark. July 25, 2013) (noting that the AMWA echoes the FLSA for

overtime and "[t]here can't be a double recovery" for such a "duplicative claim").  "In

fact, the Arkansas Department of labor 'may rely on the interpretations of the U.S.

Department of Labor and federal precedent established under the Fair labor Standards Act

in interpreting and applying the provisions of [the Arkansas Minimum Wage Act] ...

except to the extent a different interpretation is clearly required."  *Helmert*, 805

F.Supp.2d at 663 n.8 (quoting 010.14.1 Ark. Code R. § 112).

    For the same reasons the Court finds that plaintiffs were employed in a bona fide

executive capacity and, thus, exempt from the FLSA's overtime pay requirements, the

Court finds that plaintiffs were also exempt from the AMWA's overtime pay

requirements.  Accordingly, the Court grants ConAgra's motion for summary judgment

on plaintiffs' AMWA claim.[17]

3.

    Finally, plaintiffs do not address in their response to ConAgra's motion for

summary judgment ConAgra's argument that it is entitled to summary judgment on

---

[17] When federal and state claims are joined and the federal claims are dismissed on a
motion for summary judgment, the supplemental state claims are in most cases dismissed
without prejudice to avoid needless decisions of state law as a matter of comity.  See *Birchem v.
Knights of Columbus*, 116 F.3d 310, 314 (8th Cir. 1997) (citations omitted).  However, where
discovery is completed and the case ready for trial (as here), a court does not abuse its discretion
in taking up and granting summary judgment on issues of state law on which there is little basis
for dispute.  *Id*.; see also *Brown v. Mortgage Electronic Registration Systems, Inc*., 738 F.3d
926, 933-34 (8th Cir. 2013) (finding it was both fair to the parties and a proper application of
comity for the district court to decide state claims upon dismissing federal claims where the state
claims were not novel, and there was little basis for dispute as to the resolution of the state
claims as they involved well-understood and settled principles of Arkansas law).

plaintiffs' unjust enrichment/quantum meruit claim.  Accordingly, plaintiffs have waived

that argument and the Court thus grants ConAgra's motion for summary judgment on

plaintiffs' unjust enrichment/quantum meruit claim.  See *Satcher v. University of*

*Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("failure to

oppose a basis for summary judgment constitutes waiver of that argument").[18]

III.

For the foregoing reasons, the Court grants ConAgra's motion for summary

judgment [doc.#69].  The Court will enter judgment accordingly.

IT IS SO ORDERED this 6th day of January 2015.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE

---

[18] Even if plaintiffs had not waived ConAgra's argument concerning their unjust
enrichment/quantum meruit claim, the Court would grant summary judgment to ConAgra on the
merits of that claim.  Under Arkansas law,"[q]uantum meruit is generally applied under the
theory of unjust enrichment and is measured by the value of the benefit conferred on the party
unjustly enriched."  *Central Arkansas Foundation Homes, LLC v. Choate*, 2011 Ark.App. 260,
*11-12, 383 S.W.3d 418, 425-26 (citation omitted).  "To find unjust enrichment, a party must
have received something of value, to which he was not entitled and which he must restore."
*Farmer v. Riddle*, 2011 Ark.App. 120, *2 (citation omitted).  Here, plaintiffs' FLSA and AMWA
claims are without merit and plaintiffs thus have not shown that ConAgra received something of
value to which it was not entitled.